**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

| | |
|---|---|
| LOGAN ALDRIDGE, *individually and on behalf of all others similarly situated*, <br><br> Plaintiff, <br><br> v. <br><br> NORTON HEALTHCARE, INC., <br><br> Defendant. | Case No. 3:24-CV-25-BJB <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Logan Aldridge ( "Plaintiff"), individually and on behalf of all others similarly situated, hereby brings this Class Action Complaint against Norton Healthcare, Inc. ("Norton" or "Defendant"), and alleges, upon personal knowledge as to his own actions and counsel's investigations, and upon information and good faith belief as to all other matters, as follows:

### NATURE OF THE ACTION

1.      Plaintiff brings this class action against Defendant for its failure to properly secure and to safeguard personally identifiable information ("PII"), including Plaintiff's and Class Members' names, contact information, Social Security numbers, and dates of birth, (collectively, "Private Information" or "PII") and health information, medical identification numbers, and insurance information, which is protected health information ("protected health information" or "PHI", and collectively with PII, "Private Information") as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

2.      On or about May 9, 2023, Norton became aware that it was experiencing a cybersecurity incident. Norton investigated the nature and scope of the incident and through its

1

investigation, Norton determined that between May 7, 2023, and May 9, 2023 its network and servers were accessed by unauthorized third parties, resulting in information on its network being accessed without authorization. Amongst the information accessed by the unauthorized third parties was Plaintiff's and Class Members' Private Information (the "Data Breach").

3.      Although Defendant knew about the breach since May 9, 2023, affected patients were not notified of the Data Breach until some time after December 8, 2023, almost seven months after the breach was discovered, thus depriving Plaintiff and Class Members of the ability to promptly mitigate potential adverse consequences resulting from the Data Breach. As a result of Defendant's delay in detecting and notifying consumers of the Data Breach, the risk of fraud for Plaintiff and Class Members has been driven even higher.

4.      Upon information and good faith belief, Defendant was on notice of the high potentiality for this exact sort of data security incident and yet maintained the Private Information in a negligent manner. In particular, the Private Information was maintained on computer systems and networks that were in a condition vulnerable to cyberattack. Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Defendant and, thus, Defendant was on notice that failing to take appropriate protective measures would expose and increase the risk that the Private Information could be compromised and stolen.

5.      As a result, Plaintiff's and Class Members' Private Information has been compromised, and they now face an ongoing risk of identity theft, which is heightened here by the loss of Social Security numbers – the gold standard for identity thieves. The exposed Private Information of Plaintiff and Class Members can, and likely will, be sold repeatedly on the dark web.

6.       In addition to the ongoing risk of identity theft, those impacted by the Data Breach have suffered numerous actual and concrete injuries and damages, including: (a) invasion of privacy; (b) financial "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) financial "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) the loss of benefit of the bargain (price premium damages); (h) diminution of value of their Private Information; (i) anxiety, annoyance and nuisance, and (j) the continued risk to their Private Information, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

7.       While many details of the Data Breach remain in the exclusive control of Defendant, upon information and belief, Defendant breached its duties and obligations by failing, in one or more of the following ways: (1) failing to design, implement, monitor, and maintain reasonable network safeguards against foreseeable threats; (2) failing to design, implement, and maintain reasonable data retention policies; (3) failing to adequately train staff on data security; (4) failing to comply with industry-standard data security practices; (5) failing to warn Plaintiff and Class Members of Defendant's inadequate data security practices; (6) failing to encrypt or adequately encrypt the Private Information; (7) failing to recognize or detect that its network had been compromised and accessed in a timely manner to mitigate the harm; (8) failing to utilize widely available software able to detect and prevent this type of attack, and (9) otherwise failing to secure the hardware using reasonable and effective data security procedures free of foreseeable vulnerabilities and data security incidents.

3

8.      Plaintiff seeks to remedy these harms on behalf of himself and all similarly situated individuals whose Private Information was accessed during the Data Breach. Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, future costs of identity theft monitoring, and injunctive relief, including improvements to Defendant's data security systems and future annual audits.

9.      Plaintiff, therefore, brings this class action lawsuit on behalf of those similarly situated to address Defendant's inadequate safeguarding of Class Members' Private Information that it collected and maintained, and for failing to provide adequate notice to Plaintiff and other Class Members that his information had been subject to the unauthorized access of an unknown third party and precisely what specific type of information was accessed. Accordingly, Plaintiff brings this action against Defendant, seeking redress for its unlawful conduct and asserting claims for: (i) negligence, (ii) breach of fiduciary duty, (iii) unjust enrichment, (iv) breach of implied contract, and (v) breach of express contract.

## PARTIES

10.      Plaintiff Logan Aldridge received a letter dated December 8, 2023 from Defendant notifying him that its network had been accessed and that his Private Information was involved in the Data Breach.

11.      Plaintiff Aldridge is a citizen of the State of Kentucky residing in Hart County, Kentucky.

12.      Defendant Norton Healthcare, Inc. is a non-profit corporation formed under the state laws of the Commonwealth of Kentucky, with a principal place of business located at 4967 U.S. Highway 42, Suite 101, Louisville, Kentucky.

## JURISDICTION & VENUE

13.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members, and minimal diversity exists because many putative class members are citizens of a different state than Defendant. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

14.     This Court has personal jurisdiction over Defendant because it operates and maintains its principal place of business in this District.

15.     Venue is proper in this District under 28 U.S.C. § 1391(a) through (d) because Defendant's principal place of business is located in this District; Defendant maintains class members' PII/PHI in this District; and Defendant caused harm to class members residing in this District.

## FACTUAL ALLEGATIONS

### *Defendant's Business*

16.     Norton Healthcare, Inc. is a hospital and health care system that serves "adult and pediatric patients from throughout Greater Louisville, Southern Indiana, the commonwealth of Kentucky and beyond."[1] Norton operates over 40 clinics and hospitals in and around Louisville, Kentucky.  Norton's hospitals provide inpatient and outpatient general care as well as heart, neuroscience, cancer, orthopedic, women's and pediatric services

---

[1] *See https://Nortonhealthcare.com/about-us/* (last accessed January 7, 2024).

17.     In the ordinary course of receiving treatment and health care services from Defendant, patients and their families are required to provide Defendant with sensitive, personal, and private information such as:

- Name, address, phone number and email address;

- Date of birth;

- Demographic information;

- Social Security number;

- Information relating to individual medical history;

- Insurance information and coverage;

- Information concerning an individual's doctor, nurse, or other medical providers;

- Photo identification;

- Employer information; and

- Other information that may be deemed necessary to provide care.

18.     Defendant also gathers certain medical information about patients and creates records of the care it provides them.

19.     Defendant allows that it may share patient information for various purposes without a written authorization, including for treatment, billing purposes and to run the organization, as disclosed in Defendant's Notice of Privacy Practices (the "Privacy Policy").[2]  The current Privacy Policy has an effective date of June 30, 2021.

20.     The Privacy Policy is provided to every patient upon request and is posted on Defendant's website.

---

[2]     https://nortonhealthcare.com/hipaa/ (last accessed January 7, 2024).

21.     Because of the highly sensitive and personal nature of the information Defendant acquires and stores with respect to its patients, Defendant maintains that it promises it is "committed to protecting patients' personal medical information"[3]  Defendant's Privacy Policy lists several instances where it may disclose Private Information, none of which include disclosing the sensitive Private Information to unauthorized cyber-criminals.  Despite this, Defendant claims that "[o]ther uses and disclosures of medical information not covered by this notice or the laws that apply to Norton Healthcare will be made only with the patient's written permission or as otherwise permitted by law."[4]

22.     In the course of treating patients, Defendant acquires, collects, and stores a massive amount of personally identifiable information on its patients.

23.     As a condition of receiving medical care and treatment from Defendant, Defendant requires that its patients entrust it with highly sensitive personal information.

24.     By obtaining, collecting, using, and deriving a benefit from Plaintiff and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff and Class Members' Private Information from disclosure.

25.     Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their Private Information.

26.     Plaintiff and the Class Members relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

---

[3]     *Id.*

[4]     *Id*.

7

### The Data Breach

27.     On or about May 9, 2023, Defendant became aware that was experiencing a cybersecurity incident that it later determined was caused by a ransomware attack.

28.     Following a forensic investigation, Defendant discovered that cybercriminals had accessed a set of electronically stored personal information stored on its network between May 7, 2023 and May 9, 2023.

29.     Defendant's Notice Letter admits that Plaintiff's and Class Members' Private Information was accessed without authorization.[5]

30.     The type of Private Information accessed by the unauthorized actor in the Data Breach includes full names, contact information, Social Security numbers, dates of birth, health information, medical identification numbers, and insurance information.[6]

31.     While Norton stated in its Notice Letter that the unusual activity occurred and was discovered on May 9, 2023, Norton did not begin notifying victims until approximately December 8, 2023, almost seven months after Norton discovered the Data Breach occurred.[7]

### Plaintiff Logan Aldridge's Experience

32.     Plaintiff Aldridge was a patient of Norton and received medical services from Norton.  As a requisite to receiving medical services from Defendant, Plaintiff Aldridge provided his Private Information to Defendant and trusted that the information would be safeguarded according to state and federal law. Upon receipt, Plaintiff Aldridge's Private Information was entered and stored in Defendant's network and systems.

---

[5]      *See* Notice Letter, attached hereto as Exhibit A.

[6]      *Id*.

[7]      *Id*.

33.    Plaintiff Aldridge is very careful about sharing his sensitive Private Information, and he has never knowingly transmitted unencrypted sensitive Private Information.

34.    Plaintiff Aldridge stores any documents containing his sensitive Private Information in a safe and secure location or destroys the documents. Moreover, Plaintiff Aldridge diligently chooses unique usernames and passwords for his various online accounts. Had he known Defendant failed to follow basic industry security standards and failed to implement systems to protect his Private Information, he would not have provided that information to Defendant.

35.    The Notice Letter dated December 8, 2023 from Defendant notified Plaintiff Aldridge that its network had been accessed and Plaintiff Aldridge's Private Information may have been involved in the Data Breach, which may have included full names, contact information, Social Security numbers, dates of birth, health information, medical identification numbers, and insurance information.

36.    Furthermore, Defendant directed Plaintiff Aldridge to be vigilant and to take certain steps to protect his Private Information and otherwise mitigate his damages.

37.    As a result of the Data Breach, Plaintiff Aldridge heeded Defendant's warning and spent time dealing with the consequences of the Data Breach, which included time spent verifying the legitimacy of the Notice of Data Breach and self-monitoring his accounts and credit reports to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured. Moreover, this time was spent at Defendant's direction by way of the Data Breach notice where Defendant advised Plaintiff Aldridge to mitigate his damages by, among other things, "remain[ing] vigilant for incidents of fraud and identity theft by reviewing credit card account statements and monitoring your credit report for unauthorized activity."[8]

---

[8]      Notice Letter

38.     However, even with the most diligent response, the harm caused to Plaintiff Aldridge cannot be undone.

39.     Plaintiff Aldridge further suffered actual injury in the form of damages to and diminution in the value of his Private Information—a form of intangible property that Plaintiff Aldridge entrusted to Defendant, which was compromised as a result of the Data Breach.

40.     He also lost his benefit of the bargain by paying for medical services that failed to provide the data security that was promised.

41.     Plaintiff Aldridge suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns about the loss of his privacy.

42.     Plaintiff Aldridge has suffered imminent and impending injury arising from the present and ongoing risk of fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of unauthorized third parties and possibly criminals.

43.     Future identity theft monitoring is reasonable and necessary, and such services will include future costs and expenses.

44.     Plaintiff Aldridge has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

### *The Data Breach Was Eminently Foreseeable*

45.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members and the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

46.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to potentially hundreds of thousands of individuals' detailed, personal information and thus the significant number of individuals who would be harmed by the exposure of the unencrypted data.

47.     As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[9]

48.     Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in the healthcare industry preceding the date of the breach.

49.     In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020. Of the 1,862 recorded data breaches, 330 of them, or 17.7% were in the medical or healthcare industry.[10] The 330 reported breaches in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.

50.     In light of recent high profile cybersecurity incidents at other healthcare partner and provider companies, including American Medical Collection Agency (25 million patients, March 2019), University of Washington Medicine (974,000 patients, December 2018), Florida Orthopedic Institute (640,000 patients, July 2020), Wolverine Solutions Group (600,000 patients, September 2018), Oregon Department of Human Services (645,000 patients, March 2019), Elite Emergency Physicians (550,000 patients, June 2020), Magellan Health (365,000 patients, April

---

[9] See How to Protect Your Networks from RANSOMWARE, at 3, available at https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view  (last accessed Jun. 12, 2023).

[10]     See 2021 Data Breach Annual Report, 6 (ITRC, Jan. 2022), available at https://notified.idtheftcenter.org/s/ (last accessed Jun. 12, 2023).

2020), and BJC Health System (286,876 patients, March 2020), Defendant knew or should have known that its electronic records would be targeted by cybercriminals.

51.     Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals… because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[11]

52.     In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks between 2019 and 2020.[12]

53.     Therefore, the increase in such attacks, and the attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

### Value of PII & PHI

54.     The PII of consumers remains of high value to criminals, as evidenced by the prices offered through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[13] According to the Dark Web Price Index for 2021, payment card details for an account balance up to $1,000 have an average market value of $150, credit card details with an account balance up to $5,000 have an average market value of

---

[11]     FBI, Secret Service Warn of Targeted, Law360 (Nov.18,2019), https://www.law360.com/articles/1220974/fbisecret-service-warn-of-targeted-ransomware

[12]     *See* Maria Hernandez, Iowa City Hospital Suffers Phishing Attack, Security Magazine (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack (last accessed Jun. 12, 2023).

[13]     *Your personal data is for sale on the dark web. Here's how much it costs*, Digital Trends, Oct. 16, 2019, *available at* https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed Jun. 12, 2023).

$240, stolen online banking logins with a minimum of $100 on the account have an average market value of $40, and stolen online banking logins with a minimum of $2,000 on the account have an average market value of $120.[14] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[15]

55.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts.

56.     This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information…[is] worth more than 10x on the black market."[16]

57.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing, or even give false information to police.

58.     The fraudulent activity resulting from the Data Breach may not come to light for years.

59.     Theft of PHI is also gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."

---

[14]     *Dark Web Price Index 2021*, Zachary Ignoffo, March 8, 2021, available at: https://www.privacyaffairs.com/dark-web-price-index-2021/ (last accessed Jun. 12, 2023).

[15]     *In the Dark,* VPNOverview, 2019, *available at* https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last accessed Jun. 12, 2023).

[16]     Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers,* IT World, (Feb. 6, 2015), *available at* https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last accessed Jun. 12, 2023).

60.     There is also a robust legitimate market for the type of sensitive information at issue here. Marketing firms utilize personal information to target potential customers, and an entire economy exists related to the value of personal data.

61.     Drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase PII and PHI on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

62.     Moreover, there may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[17]

63.     As such, future monitoring of financial and personal records is reasonable and necessary well beyond the one of protection offered by Defendant.

***Defendant Failed to Properly Protect Plaintiff's and Class Members' Private Information***

64.     Defendant could have prevented this Data Breach by properly securing and encrypting the systems containing the Private Information of Plaintiff and Class Members. Alternatively, Defendant could have destroyed the data, especially for individuals with whom its relationship had ended a significant period of time prior to the breach.

---

[17]     *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at*: https://www.gao.gov/assets/gao-07-737.pdf (last accessed Jun. 12, 2023).

14

65.    Defendant's negligence in safeguarding the Private Information of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to companies like Defendant to protect and secure sensitive data they possess.

66.    Despite the prevalence of public announcements of data breaches and data security compromises, Defendant failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

67.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[18]

68.    The ramifications of Defendant's failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

69.    To prevent and detect unauthorized cyber-attacks, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.
- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and

---

[18]    *See generally Fighting Identity Theft With the Red Flags Rule: A How-To Guide for Business*, Fed. Trade Comm., https://www.ftc.gov/business-guidance/resources/fighting-identity-theft-red-flags-rule-how-guide-business (last accessed Jun. 12, 2023).

Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.
- Configure firewalls to block access to known malicious IP addresses.
- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.
- Set anti-virus and anti-malware programs to conduct regular scans automatically.
- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.
- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.
- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.
- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.
- Consider disabling Remote Desktop protocol (RDP) if it is not being used.
- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.
- Execute operating system environments or specific programs in a virtualized environment.
- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[19]

70.     To prevent and detect cyber-attacks, including the cyber-attack that resulted in the

Data Breach, Defendant could and should have implemented, as recommended by the United

States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer**.  Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks…
- **Use caution with links and when entering website addresses.**  Be careful when clicking directly on links in emails, even if the sender appears to be someone you know.

---

[19]     *Id.* at 3-4.

Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net)…

- **Open email attachments with caution.** Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.
- **Keep your personal information safe.** Check a website's security to ensure the information you submit is encrypted before you provide it….
- **Verify email senders.** If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.
- **Inform yourself.** Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.
- **Use and maintain preventative software programs.** Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic…[20]

71.    To prevent and detect cyber-attacks, including the cyber-attack that resulted in the

Data Breach, Defendant could and should have implemented, as recommended by the Microsoft

Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

---

[20]    *See* Cybersecurity & Infrastructure Security Agency, *Protecting Against Ransomware* (original release date Apr. 11, 2019), *available at* https://www.cisa.gov/news-events/news/protecting-against-ransomware (last accessed Jun. 12, 2023).

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[21]

72.     Moreover, given that Defendant was storing the PII and PHI of Plaintiff and Class Members, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

73.     The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of the PII of Plaintiff and Class Members.

74.     As a result of computer systems in need of security upgrades and inadequate procedures for handling email phishing attacks, viruses, malignant computer code, and hacking

---

[21]     *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last accessed Jun. 12, 2023).

attacks, Defendant negligently and unlawfully failed to safeguard Plaintiff's and Class Members'
Private Information.

75.    Because Defendant failed to properly protect and safeguard Plaintiff's and Class
Members' Private Information, an unauthorized third party was able to access Defendant's
network, and access Defendant's database and system configuration files and exfiltrate that data.

### Defendant Failed to Comply with FTC Guidelines

76.    The FTC has promulgated numerous guides for businesses that highlight the
importance of implementing reasonable data security practices. According to the FTC, the need
for data security should be factored into all business decision making.

77.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide
for Business, which established cyber-security guidelines for businesses. The guidelines note that
businesses should protect the personal patient information that they keep; properly dispose of
personal information that is no longer needed; encrypt information stored on computer networks;
understand their network's vulnerabilities; and implement policies to correct any security
problems.[22]

78.    The guidelines also recommend that businesses use an intrusion detection system
to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone
is attempting to hack the system; watch for large amounts of data being transmitted from the
system; and have a response plan ready in the event of a breach.

79.    The FTC further recommends that companies not maintain PII longer than is
needed for authorization of a transaction; limit access to sensitive data; require complex passwords

---

[22]    Protecting Personal Information: A Guide for Business, Federal Trade Commission (2016),
*available   at*   https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-
business (last accessed Jun. 12, 2023).

to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

80.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions clarify the measures businesses take to meet their data security obligations.

81.     Defendant failed to properly implement basic data security practices.

82.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

83.     Defendant was always fully aware of their obligation to protect the Private Information of Plaintiff and Class Members. Defendant was also aware of the significant repercussions that would result from their failure to do so.

### Defendant Failed to Comply with Industry Standards

84.     As shown above, experts studying cyber security routinely identify healthcare providers as particularly vulnerable to cyberattacks because of the value of the PII and PHI they collect and maintain.

85.     Several best practices have been identified that, at a minimum, should be implemented by healthcare service providers like Defendant, including, but not limited to educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus,

and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

86.     Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

87.     Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

88.     The foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendant failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

89.     Upon information and belief, Defendant failed to comply with one or more of the foregoing industry standards.

### *Defendant's Negligent Acts & Breaches*

90.     Defendant participated in and controlled the process of gathering Private Information from Plaintiff and Class Members.

91.     Defendant, therefore, assumed and otherwise owed duties and obligations to Plaintiff and Class Members to take reasonable measures to protect the information, including the

duty of oversight, training, instruction, testing of the data security policies and network systems. Defendant breached these obligations to Plaintiff and Class Members and/or were otherwise negligent because it failed to properly implement data security systems and policies for its health providers network that would adequately safeguarded Plaintiff's and Class Members' Sensitive Information.

92.     Upon information and belief, Defendant's unlawful conduct included, but is not limited to, one or more of the following acts and/or omissions:

a)  Failing to design and maintain an adequate data security system to reduce the risk of data breaches and protect Plaintiff's and Class Members' Sensitive Information;

b)  Failing to properly monitor its data security systems for data security vulnerabilities and risk;

c)  Failing to test and assess the adequacy of its data security system;

d)  Failing to develop adequate training programs related to the proper handling of emails and email security practices;

e)  Failing to develop and put into place uniform procedures and data security protections for its healthcare network;

f)  Failing to adequately fund and allocate resources for the adequate design, operation, maintenance, and updating necessary to meet industry standards for data security protection;

g)  Failing to ensure or otherwise require that it was compliant with FTC guidelines for cybersecurity;

h)  Failing to ensure or otherwise require that it was adhering to one or more industry standards for cybersecurity discussed above;

22

i)   Failing to implement or update antivirus and malware protection software in need of security updating;

j)   Failing to require encryption or adequate encryption on its data systems;

k)   Otherwise negligently and unlawfully failing to safeguard Plaintiff's and Class Members' Private Information provided to Defendant, which in turn allowed cyberthieves to access its IT systems.

## COMMON INJURIES & DAMAGES

93.     As result of Defendant's ineffective and inadequate data security practices, Plaintiff and Class Members now face a present and ongoing risk of fraud and identity theft.

94.     Due to the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) the loss of benefit of the bargain (price premium damages); (h) diminution of value of their Private Information; and (i) the continued risk to their Private Information, which remains in Defendant's possession, and which is subject to further breaches, so long as Defendant fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

### *The Risk of Identity Theft to Plaintiff & Class Members Is Present and Ongoing*

95.    The link between a data breach and the risk of identity theft is well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals, who then utilize the information to commit a variety of identity theft-related crimes discussed below.

96.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity – or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

97.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

98.    The dark web is an unindexed layer of the internet that requires special software or authentication to access.[23] Criminals, in particular, favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or 'surface' web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is

---

[23]    *What Is the Dark Web?,* Experian, *available at* https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last accessed Jun. 12, 2023).

ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[24] This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

99.     A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, personal and medical information like the PII at issue here.[25] The digital character of PII stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information.[26] As Microsoft warns, "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[27]

100.     Social Security numbers, for example, are among the worst kinds of personal information to have stolen because they may be put to numerous serious fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not

---

[24]     *Id.*

[25]     *What is the Dark Web?* – Microsoft 365, *available at* https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web (last accessed Jun. 12, 2023).

[26]     *Id*.

[27]     *Id*.

find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[28]

What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

101.    Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[29]

102.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name. And the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[30]

---

[28]    Social Security Administration, *Identity Theft and Your Social Security Number*, *available at* https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed Jun. 12, 2023).

[29]    Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at* http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last accessed Jun. 12, 2023).

[30]    Social Security Administration, *supra* note 28.

103.     According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[31]

104.     Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[32] Defendant did not rapidly report to Plaintiff and the Class that their Private Information had been stolen.

105.     Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

106.     In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims have to spend a considerable amount of time repairing the damage caused by the theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

107.     Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiff and Class Members will need to remain vigilant against unauthorized data use for years or even decades to come.

---

[31]     *See* https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last accessed Jun. 12, 2023).

[32]     *Id.*

27

108.     The FTC has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated, "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."[33]

109.     The FTC has also issued numerous guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making.

110.     According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; (5) using industry-tested and accepted methods for securing data; (6) monitoring activity on networks to uncover unapproved activity; (7) verifying that privacy and security features function properly; (8) testing for common vulnerabilities; and (9) updating and patching third-party software.[34]

111.     According to the FTC, unauthorized PII disclosures are extremely damaging to consumers' finances, credit history and reputation, and can take time, money and patience to resolve the fallout. The FTC treats the failure to employ reasonable and appropriate measures to

---

[33]     Statement of FTC Commissioner Pamela Jones Harbour (Remarks Before FTC Exploring Privacy Roundtable), http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf (last accessed Jun. 12, 2023).

[34]     *See generally* https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last accessed Jun. 12, 2023).

protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.[35]

112.    Defendant's failure to properly notify Plaintiff and Class Members of the Data Breach exacerbated Plaintiff's and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

### *Loss of Time to Mitigate the Risk of Identity Theft and Fraud*

113.    As a result of the recognized risk of identity theft, when a Data Breach occurs and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the resource and asset of time has been lost.

114.    Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must, as Defendant's Notice instructs them, "monitor your accounts" and "remain vigilant."

115.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing

---

[35]     *See, e.g.*, https://www.ftc.gov/news-events/news/press-releases/2016/07/commission-finds-labmd-liable-unfair-data-security-practices (last accessed Jun. 12, 2023).

passwords, reviewing and monitoring credit reports and accounts for unauthorized activity—which may take years to discover and detect—and filing police reports.

116.   Plaintiff's mitigation efforts are consistent with the GAO, which released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[36]

117.   Plaintiff's mitigation efforts are also consistent with the steps that the FTC recommends that data breach victims take to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (and consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[37]

118.   A study by the Identity Theft Resource Center shows the multitude of harms caused by the fraudulent use of personal and financial information:[38]

---

[36]     *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf (last accessed Jun. 12, 2023).

[37]     *See* Federal Trade Commission, IdentityTheft.com, https://www.identitytheft.gov/Steps (last accessed Jun. 12, 2023).
[38]     "Credit Card and ID Theft Statistics" by Jason Steele, 10/24/2017, at: https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php.



119.    Indeed, the FTC recommends that identity theft victims take several steps and spend time to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[39]

### *Diminution of Value of the Private Information*

120.    PII is a valuable property right.[40] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison

---

[39]    *See* https://www.identitytheft.gov/Steps.

[40]    *See*, *e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

121.    For example, drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase PII/PHI on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves.

122.    Sensitive Private Information can sell for as much as $363 per record, according to the Infosec Institute.[41]

123.    Medical information is especially valuable to identity thieves. According to account monitoring company LogDog, medical data was sold on the dark web for $50 and up.[42]

124.    An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[43] In fact, the data marketplace is so sophisticated that consumers can sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[44]

---

[41]      *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), *available at* https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last accessed Jun. 12, 2023).

[42]      *See* Lisa Vaas, *Ransomwear attacks paralyze, and sometimes crush, hospitals*, *available at* https://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/#content (last accessed Jun. 12, 2023).

[43]      *See* David Lazarus, Column: Shadowy data brokers make the most of her invisibility cloak, *available at* https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last accessed Jun. 12, 2023).

[44]      *See* https://datacoup.com/ (last accessed Jun. 12, 2023).

Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[45]

125.    As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished in its value by its unauthorized and potential release onto the Dark Web, where it may soon be available and holds significant value for the threat actors.

126.    To date, Defendant has done little to provide Plaintiff and Class Members with relief for the damages they have suffered as a result of the Data Breach—Defendant has only offered twelve months of inadequate identity monitoring services through TransUnion despite Plaintiff and all Class Members being at risk of identity theft and fraud for the foreseeable future.

127.    The twelve months of credit monitoring is wholly inadequate as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face years of ongoing identity theft and financial fraud. Defendant also places the burden squarely on Plaintiff and Class Members by requiring them to expend time signing up for that service, as opposed to automatically enrolling all victims of this Data Breach.

128.    Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information, and the modus operandi of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes—e.g., opening bank accounts in the victims' names to make

---

[45]    Nielsen Computer & Mobile Panel, Frequently Asked Questions, *available at* https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last accessed Jun. 12, 2023).

purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

129.     Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

130.     Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts.[46] The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers).

131.     Consequently, Plaintiff and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future.

132.     The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Defendant's failure to safeguard their Private Information.

---

[46]     *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web*, New Report Finds, FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1 (last accessed Jun. 12, 2023).

*Injunctive Relief Is Necessary to Protect Against Future Data Breaches*

133.    Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing Private Information is not accessible online and that access to such data is password protected.

**KENTUCKY LAW SHOULD APPLY TO PLAINTIFFS & THE CLASS AS A WHOLE**

134.    The State of Kentucky has a significant interest in regulating the conduct of businesses operating within its borders.

135.    Kentucky, which seeks to protect the rights and interests of Kentucky and all residents and citizens of the United States against a company headquartered and doing business in Kentucky, has a greater interest in the claims of Plaintiffs and the Class than any other state and is most intimately concerned with the claims and outcome of this litigation.

136.    The principal place of business and headquarters of Norton Healthcare, Inc., located at 4967 U.S. Highway 42, Suite 101, Louisville, Kentucky 40222, is the "nerve center" of its business activities—the place where its high-level officers direct, control and coordinate Defendant's activities, including major policy decisions.

137.    Defendant's actions and corporate **decisions** surrounding the allegations made in the Complaint were made from and in Kentucky.

138.    Defendant's **breaches** of duty to Plaintiffs and Class Members emanated from Kentucky.

139.    Application **of** Kentucky law to the Class with respect to Plaintiffs' and Class Members' claims is neither arbitrary nor fundamentally unfair because Kentucky has significant contacts and a significant aggregation of contacts that create a state interest in the claims of Plaintiffs and the Class.

140.     Under Kentucky's choice of law principles, which are applicable to this action, the common law of Kentucky applies to the nationwide common law claims of all Class Members.

141.     Kentucky has a significant interest in regulating the conduct of businesses operating within its borders. Kentucky also has the most significant relationship to Defendant, as it is headquartered in Kentucky, its executives and officers are located in Kentucky and the decisions giving rise to the allegations and claims asserted herein were made in Kentucky. Thus, there is no conflict in applying Kentucky law to non-resident consumers such as some of the potential Class Members.

## CLASS ACTION ALLEGATIONS

142.     Plaintiff brings this action on behalf of themselves and all other similarly situated Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seek certification of the following Classes:

> **Nationwide Class:** All persons whose Private Information was actually or potentially accessed or acquired during the Data Breach.

> **Kentucky Class:** All persons in the Commonwealth of Kentucky whose Private Information was actually or potentially accessed or acquired during the Data Breach.

143.     Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

144.    Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

145.    The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

146.    Numerosity: Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are 48,000 individuals whose Private Information may have been improperly accessed in the Data Breach, and each Class is apparently identifiable within Defendant's records.

147.    Commonality: Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

    a.  Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiff and Class Members;

    b.  Whether Defendant had duties not to disclose the Private Information of Plaintiff and Class Members to unauthorized third parties;

    c.  Whether Defendant had duties not to use the Private Information of Plaintiff and Class Members for non-business purposes;

    d.  Whether Defendant failed to adequately safeguard the Private Information of Plaintiff and Class Members;

    e.  Whether and when Defendant actually learned of the Data Breach;

    f.  Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

    g.  Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their PII had been compromised;

h.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i.  Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j.  Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiff and Class Members;

k.  Whether Defendant violated the consumer protection statutes invoked herein;

l.  Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

m.  Whether Plaintiff and Class Members are entitled to restitution as a result of Defendant's wrongful conduct; and

n.  Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

148.  Typicality: Plaintiff's claims are typical of those of other Class Members because all had their Private Information compromised as a result of the Data Breach, due to Defendant's misfeasance.

149.  Predominance. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy. Defendant's policies challenged herein apply to and

affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

150.    Adequacy of Representation: Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

151.    Superiority: Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

152.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm

the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

153.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, uniform methods of data collection, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

154.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

155.    Unless a Class-wide injunction is issued, Defendant may continue in their failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

156.    Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

**CAUSES OF ACTION**

**COUNT I**
**NEGLIGENCE**
(*On Behalf of Plaintiff & All Class Members*)

157.    Plaintiff and the Class repeat and re-allege all other paragraphs of the Complaint as if fully set forth herein.

158.    Upon gaining access to the PII of Plaintiff and members of the Class, Defendant owed to Plaintiff and the Class a duty of reasonable care in handling and using this information and securing and protecting the information from being stolen, accessed, and misused by unauthorized parties. Pursuant to this duty, Defendant was required to design, maintain, and test its security systems to ensure that these systems were reasonably secure and capable of protecting the Protected Information of Plaintiff and the Class. Defendant further owed to Plaintiff and the Class a duty to implement systems and procedures that would detect a breach of their security systems in a timely manner and to timely act upon security alerts from such systems.

159.    Defendant owed this duty to Plaintiff and the other Class members because Plaintiff and the other Class members compose a well-defined, foreseeable, and probable class of individuals whom Defendant should have been aware could be injured by Defendant's inadequate security protocols. Defendant actively solicited clients who entrusted Defendant with Plaintiff's and the other Class members' Protected Information when obtaining and using Defendant's services. To facilitate these services, Defendant used, handled, gathered, and stored the Protected Information of Plaintiff and the other Class members. Attendant to Defendant's solicitation, use and storage, Defendant knew of their inadequate and unreasonable security practices with regard to their computer/server systems and also knew that hackers and thieves routinely attempt to access, steal and misuse the Protected Information that Defendant actively solicited from clients

who entrusted Defendant with Plaintiff's and the other Class members' data. As such, Defendant knew a breach of their systems would cause damage to their clients and Plaintiff and the other Class members. Thus, Defendant had a duty to act reasonably in protecting the Protected Information of their healthcare clients' patients.

160.    The duty included obligations to take reasonable steps to prevent disclosure of the Private Information, and to safeguard the information from theft. Defendant's duties included the responsibility to design, implement, and monitor data security systems, policies, and processes to protect against reasonably foreseeable data breaches such as this Data Breach.

161.    Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, policies, and procedures, and the personnel responsible for them, adequately protected the Private Information.

162.    Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and consumers and patients, which is recognized by laws and regulations including but not limited to HIPAA, the FTC Act, and common law. Defendant was in a superior position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

163.    Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(I). Some or all of the medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

42

164.    Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

165.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information that it either acquires, maintains, or stores.

166.    Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information, as alleged and discussed above.

167.    It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Plaintiff and Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

168.    It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

169.    The imposition of a duty of care on Defendant to safeguard the Private Information they maintained is appropriate because any social utility of Defendant's conduct is outweighed by the injuries suffered by Plaintiff and Class Members as a result of the Data Breach.

170.    Defendant was also negligent in failing to timely notify Plaintiff and Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

43

171.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members are at a current and ongoing risk of identity theft, and Plaintiff and Class Members sustained compensatory damages including: (a) invasion of privacy; (b) financial "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) financial "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) diminution of value of their Private Information; (h) future costs of identity theft monitoring; (i) anxiety, annoyance and nuisance, and (j) the continued risk to their Private Information, which remains in  Defendant's possession, and which is subject to further breaches, so long as Defendant fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

172.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

173.    Defendant's negligent conduct is ongoing, in that it still holds the Private Information of Plaintiff and Class Members in an unsafe and unsecure manner.

174.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT II
## REACH OF FIDUCIARY DUTY
### (*On Behalf of Plaintiff & All Class Members*)

175.    Plaintiff and the Class repeat and re-allege all other paragraphs of the Complaint as if fully set forth herein.

176.    In providing their Private Information to Defendant, Plaintiff and Class Members justifiably placed a special confidence in Defendant to act in good faith and with due regard for the interests of Plaintiff and Class Members to safeguard and keep confidential that Private Information.

177.    Defendant accepted the special confidence Plaintiff and Class Members placed in it, as evidenced by its assertion that it is committed to protecting the privacy of Plaintiff's Personal Information as included in the Data Breach Notice Letter.

178.    In light of the special relationship between Defendant, Plaintiff, and Class Members, whereby Defendant became a guardian of Plaintiff's and Class Members' Private Information, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for the benefit of its customers, including Plaintiff and Class Members for the safeguarding of Plaintiff's and Class Members' Private Information.

179.    Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of its customer relationships, in particular, to keep secure the Private Information of its customers and to timely notify Plaintiff and Class Members of a data breach and disclosure.

180.    Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to protect the integrity of the systems containing Plaintiff's and Class Members' Private Information.

181.    Defendant breached its fiduciary duties to Plaintiff and Class Members by otherwise failing to safeguard Plaintiff and Class Members' Private Information.

182.    Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to timely notify and/or warn Plaintiff and Class Members of the Data Breach.

183.    As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to:

   a.    Actual identity theft;

   b.    The compromise, publication, and/or theft of their Private Information;

   c.    Out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information;

   d.    Lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft;

   e.    The continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession;

   f.    Future costs in terms of time, effort, and money that will be expended as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and

   g.    The diminished value of the services they paid for and received.

184.     As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiff and Class Members will suffer other forms of injury and/or harm, and other economic and non-economic losses.

**COUNT III**
**UNJUST ENRICHMENT**
(***On Behalf of Plaintiff & All Class Members***)

185.     Plaintiff and the Class repeat and re-allege all other paragraphs of the Complaint as if fully set forth herein.

186.     Plaintiff and Class Members conferred a monetary benefit on Defendant. Specifically, they provided Defendant with their Private Information.

187.     In exchange, Plaintiff and Class Members should have received from Defendant data storage that was compliant with and maintained in accordance with Defendant's pre-existing duties to secure such information under federal law and industry standards and were entitled to have Defendant protect their Private Information with adequate security.

188.     Defendant knew that Plaintiff and Class Members conferred a benefit on them and accepted or retained that benefit. Defendant profited from Plaintiff's and Class Members' Private Information for business purposes.

189.     Defendant failed to secure Plaintiff's and Class Members' Private Information and therefore, did not provide full compensation for the benefit the Plaintiff's and Class Members' Private Information provided.

190.     Defendant acquired the Private Information through inequitable means as they failed to disclose the inadequate security practices previously alleged.

191.    If Plaintiff and Class Members had known that Defendant would not secure their Private Information using adequate security, they would not have provided their information to Defendant's customers.

192.    Plaintiff and Class Members have no adequate remedy at law.

193.    Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiff and Class Members conferred on them.

194.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that it unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and the Class Members overpaid for the use of Defendant's services.

## COUNT IV
## BREACH OF IMPLIED  CONTRACT
### *(On Behalf of Plaintiff & All Class Members)*

195.    Plaintiff and the Class repeat and re-allege all other paragraphs of the Complaint as if fully set forth herein.

196.    Plaintiff and Class Members were required to provide their Private Information to Defendant as a condition of their use of Defendant's services.

197.    Plaintiff and Class Members paid money to Defendant in exchange for services, along with Defendant's promise to protect their Private Information from unauthorized access and disclosure.

198.    Defendant manifested its intent to enter into an implied contract that included a contractual obligation to reasonably protect Plaintiff and Class Members' Private Information through, among other things, its Privacy Policy.

199.    Implicit in the agreement between Plaintiff and Class Members and the Defendant to provide Private Information, was the latter's obligation to (a) use such Private Information for business purposes only, (b) take reasonable steps to safeguard that Private Information, (c) prevent unauthorized disclosures of the Private Information, (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information, (e) reasonably safeguard and protect the Private Information of Plaintiff and Class Members from unauthorized disclosure or uses, and (f) retain the Private Information only under conditions that kept such information secure and confidential.

200.    When Plaintiff and Class Members provided their PII and PHI to Defendant, they entered into implied contracts with Defendant pursuant to which Defendant agreed to reasonably protect such Personal Information.

201.    In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

202.    Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure, including monitoring its computer systems and networks to ensure that it adopted reasonable data security measures.

203.    Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

204.    Defendant breached its implied contracts with Plaintiff and Class Members by failing to safeguard and protect their Private Information.

205.    As a direct and proximate result of Defendant's breaches of the implied contracts, Class Members sustained damages as alleged herein.

206.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

207.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide and continue to provide adequate credit monitoring to all Class Members.

### COUNT V
### BREACH OF EXPRESS CONTRACT
### (*On Behalf of Plaintiff & All Class Members*)

208.    Plaintiff and the Class repeat and re-allege all other paragraphs of the Complaint as if fully set forth herein.

209.    Plaintiff and Members of the Class allege that they entered into valid and enforceable express contracts or were third-party beneficiaries of valid and enforceable express contracts, with Defendant for the provision of medical and health care services.

210.    Specifically, Plaintiff entered into a valid and enforceable express contract with Defendant when Plaintiff first received medical care from Defendant.

211.    The valid and enforceable express contracts to provide medical and health care services that Plaintiff and Class Members entered into with Defendant include Defendant's promise to protect nonpublic Private Information given to Defendant or that Defendant gather on its own from disclosure.

212.    Under these express contracts, Defendant and/or its affiliated healthcare providers, promised and were obligated to (a) provide healthcare to Plaintiff and Class Members; and (b)

50

protect Plaintiff and the Class Members' Protected Information: (i) provided to obtain such healthcare; and/or (ii) created as a result of providing such healthcare. In exchange, Plaintiff and Members of the Class agreed to pay money for these services, and to turn over their Private Information.

213.   Both the provision of medical services healthcare and the protection of Plaintiff's and Class Members' Private Information were material aspects of these express contracts.

214.   The express contracts for the provision of medical services—contracts that include the contractual obligations to maintain the privacy of Plaintiff and Class Members' Private Information—are formed and embodied in multiple documents, including (among other documents) Defendant's Privacy Policy.

215.   At all relevant times, Defendant expressly represented in its Privacy Policy the following: (i) that it is "committed to protecting the privacy of all visitors to its website"; (ii) that its "goal is to maintain compliance with the highest standards of website privacy so our visitors may comfortably and safely use our website for a variety of health care information and service needs"; and (iii) that it "will comply with the privacy practices described in this Notice and to do our best to treat protected health information about you with the utmost care."[47]

216.   Defendant's express representations, including, but not limited to, express representations found in its Privacy Policy, formed and embodied an express contractual obligation requiring Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiff and Class Members' Private Information.

---

[47]   *See* Privacy Policy, https://www.cfmedicalcenter.com/notice-privacy-practices/#:~:text=We%20will%20use%20and%20disclose,in%20taking%20care%20of%20you. (last accessed October 22, 2023).

217.    Consumers of healthcare value their privacy, the privacy of their dependents, and the ability to keep their Private Information associated with obtaining healthcare private. To customers such as Plaintiff and Class Members, healthcare that does not adhere to industry standard data security protocols to protect Private Information is fundamentally less useful and less valuable than healthcare that adheres to industry-standard data security. Plaintiff and Class Members would not have entered into these contracts with Defendant and/or its affiliated healthcare providers as a direct or third-party beneficiary without an understanding that their Private Information would be safeguarded and protected.

218.    A meeting of the minds occurred, as Plaintiff and Members of the Class agreed to and did provide their Private Information to Defendant and/or its affiliated healthcare providers, and paid for the provided healthcare in exchange for, amongst other things, both the provision of healthcare and medical services and the protection of their Private Information.

219.    Plaintiff and Class Members performed their obligations under the contract when they paid for their health care services and provided their Private Information.

220.    Defendant materially breached its contractual obligation to protect the nonpublic Private Information Defendant gathered when the information was accessed and exfiltrated by unauthorized personnel as part of the Data Breach.

221.    Defendant materially breached the terms of these express contracts, including, but not limited to, the terms stated in the relevant Privacy Policy. Defendant did not maintain the privacy of Plaintiff's and Class Members' Private Information as evidenced by its notifications of the Data Breach to Plaintiff and more than 216,000 Class Members. Specifically, Defendant did not comply with industry standards, standards of conduct embodied in statutes like HIPAA and

Section 5 of the FTCA, or otherwise protect Plaintiff's and the Class Members' Private Information, as set forth above.

222.    The Data Breach was a reasonably foreseeable consequence of Defendant's actions in breach of these contracts.

223.    As a result of Defendant's failure to fulfill the data security protections promised in these contracts, Plaintiff and Members of the Class did not receive the full benefit of the bargain. Instead, they received healthcare and other services that were of a diminished value to that described in the contracts. Plaintiff and Class Members, therefore, were damaged in an amount at least equal to the difference in the value of the healthcare with data security protection they paid for and the healthcare they received.

224.    Had Defendant disclosed that its security was inadequate or that it did not adhere to industry-standard security measures, neither the Plaintiff, the Class Members, nor any reasonable person would have purchased healthcare from Defendant and/or its affiliated healthcare providers.

225.    As a direct and proximate result of the Data Breach, Plaintiff and Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including without limitation the release, disclosure, and publication of their Private Information, the loss of control of their Private Information, the imminent risk of suffering additional damages in the future, disruption of their medical care and treatment, out-of-pocket expenses, and the loss of the benefit of the bargain they had struck with Defendant.

226.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

<u>COUNT VI</u>
**VIOLATIONS OF THE KENTUCKY CONSUMER PROTECTION ACT**
**Ky. Rev. Stat. § 367.110, et seq.**
*(On Behalf of Plaintiff & Kentucky Class Members)*

227.    Plaintiff and the Class repeat and re-allege all other paragraphs of the Complaint as if fully set forth herein.

228.    Norton is "person" for purposes of the Kentucky Consumer Protection Act ("KCPA").

229.    Defendant's conduct as alleged herein occurred in the conduct of trade.

230.    The KCPA prohibits "unfair, false, misleading, or deceptive acts or practices in the conduct of any trade." Any person who "purchase or leases goods or services primarily for personal, financial, or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by Ky. Rev. Stat. § 367.170, may bring an action under the Rule of Civil Procedure . . . ." Ky. Rev. Stat. § 267.220.

231.    Norton violated the KCPA by concealing and failing to disclose data security vulnerabilities while touting that it values patient privacy. Norton had an ongoing duty to Plaintiff and the Kentucky Class to refrain from unfair and deceptive practices under the KCPA in the course of its business.

232.    The practices of Norton, described above, violate the KCPA, for, inter alia, one or more of the following reasons:

    o.    Actual identity theft;

    p.    The compromise, publication, and/or theft of their Private Information;

q.     Out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information;

r.     Lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft;

s.     The continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession;

t.     Future costs in terms of time, effort, and money that will be expended as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and

u.     The diminished value of the services they paid for and received.

233.   Plaintiff and the Kentucky Class suffered ascertainable loss and action damages as a direct and proximate result of Norton's concealments, misrepresentations, and/or failure to disclose material information.

234.   Norton is liable to Plaintiff and the Kentucky Class members for damages in amounts to be proven at trial, including attorney's fees, costs, and punitive damages, as well as injunctive relief enjoining Defendants' unfair and deceptive practices, and any other relief deemed just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and Class Members, respectfully requests judgment against Defendant and that the Court grant the following:

A.     For an Order certifying the Class, and appointing Plaintiff and his Counsel to represent the Class;

B.     For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Protected Information of Plaintiff and Class Members, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiff and Class Members;

C.     For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

    i.     prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

    ii.     requiring Defendant to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

    iii.     requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the

retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv.    requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

v.    prohibiting Defendant from maintaining the PII of Plaintiff and Class Members on a cloud-based database;

vi.    requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii.    requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.    requiring Defendant to audit, test, and train their security personnel regarding any new or modified procedures;

ix.    requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

x.  requiring Defendant to conduct regular database scanning and securing checks;

xi.  requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xii.  requiring Defendant to conduct internal training and education routinely and continually, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii.  requiring Defendant to implement a system of tests to assess their respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employee's compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiv.  requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv.      requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xvi.     requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and for a period of ten years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.      For an award of damages, including, but not limited to, actual, consequential, and nominal damages, as allowed by law in an amount to be determined;

E.      For an award of attorneys' fees, costs, and litigation expenses as allowed by law;

F.      For prejudgment interest on all amounts awarded; and

G.      Such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands that this matter be tried before a jury.

Date: January 12, 2024                    Respectfully Submitted,

**/s/ Amanda M. Lockaby**
Matthew T. Lockaby
Amanda M. Lockaby
John M. Ghaelian
Lockaby PLLC
476 East High Street, Suite 200
Lexington, Kentucky 40507
Tele:   859.263.7884
Fax:    859.406.3333
Email: mlockaby@lockabylaw.com
         alockaby@lockabylaw.com
         jghaelian@lockabylaw.com


David S. Almeida
*(pro hac vice forthcoming)*
Illinois Bar No. 100530
Matthew J. Langley
*(pro hac vice forthcoming)*
Illinois Bar No. 6337129
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
(312) 576-3024
david@almeidalawgroup.com
matt@almeidalawgroup.com

*COUNSEL FOR PLAINTIFF*
*& THE CLASS*